UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON


CIVIL ACTION NO. 10-64-GWU


WILMA BARNETT,                                                    PLAINTIFF,


VS.                              **MEMORANDUM OPINION**


MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                    DEFENDANT.


## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of her application for Disability Insurance Benefits (DIB).  The appeal is

currently before the court on cross-motions for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation

process in assessing whether a claimant is disabled.

1.    Is the claimant currently engaged in substantial gainful activity?
      If so, the claimant is not disabled and the claim is denied.

2.    If the claimant is not currently engaged in substantial gainful
      activity, does he have any "severe" impairment or combination
      of impairments--i.e., any impairments significantly limiting his
      physical or mental ability to do basic work activities?  If not, a
      finding of non-disability is made and the claim is denied.

3.    The third step requires the Commissioner to determine
      whether the claimant's severe impairment(s) or combination of
      impairments meets or equals in severity an impairment listed

1

in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments). If so, disability is conclusively presumed and benefits are awarded.

4.    At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work. If so, the claimant is not disabled and the claim is denied. If the plaintiff carries this burden, a prima facie case of disability is established.

5.    If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the issues with the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim.  Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982).  This presumes, of course, that the treating physician's opinion is based on objective medical findings.  Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).  Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary.  Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987).  These have long been well-settled principles within the Circuit.  Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain.  Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms.  20 C.F.R. § 404.1529 (1991).  However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine:  (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment.  The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability.  Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984).  However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id.  Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups.  Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987).  Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987).  The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all.  Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case.  Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had.  E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category

if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. § 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions  .  .  .  or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance

on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments.  <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Wilma Barnett, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of rheumatoid arthritis, left shoulder acromioclavicular joint osteoarthritis, non-insulin dependent diabetes mellitus, a history of pericarditis, nicotine abuse, and degenerative disc disease of the lumbar spine.  (Tr. 17).  Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that Mrs. Barnett retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits.  (Tr. 20-4).  The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether the plaintiff, a 50-year-old woman with a post-high school education and work experience as a material handler, ophthalmology technician, and delicatessen worker, could perform any jobs if she could lift 10 pounds occasionally and 5 to 10 pounds frequently, with standing and walking limited to two hours and sitting limited to six hours in an eight-hour day, and also had the following non-exertional restrictions.  She: (1) could not climb ladders, ropes, or scaffolds; (2) could occasionally stoop, kneel, crouch, or

crawl; (3) could have no exposure to temperature extremes, vibration, or vibrating hand tools; and (4) could only occasionally perform fine motor manipulation such as pinching, fingering, and grasping.  (Tr. 312-13).  The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national economies.  (Tr. 313).

On appeal, this court must determine whether the administrative decision is supported by substantial evidence.

Mrs. Barnett alleged disability beginning July 24, 2005 due to rheumatoid arthritis, which caused constant pain in her major joints, swelling of the hands, and back pain.  (Tr. 102).  At the administrative hearing, she testified that she had stopped her last job as an ophthalmology technician because she was missing too much work due to her hand problems.  (Tr. 298).  The rheumatoid arthritis also bothered her knees.  (Tr. 299).  Her rheumatologist, Dr. Kelly Cole, had prescribed a medication called Remicade which she took intravenously every five weeks, in a process lasting four hours.  (Tr. 300-1).  These treatments made her feel ill, and gave her migraine headaches for two days.  (Tr. 306).  Afterwards, there would be an improvement in her pain, particularly in the knees, until the medication wore off a week or so before the next scheduled dose.  (Id.).  She was also on several other medications for arthritic pain, including Lortab and Arthrotec, from a family physician.  (Tr. 302).  She could hardly write because of swollen knuckles, had a

poor grip, and had difficulty opening things such as doors and jars.  (Tr. 307).  She also had difficulty with buttons and zippers and could not cut up meat.  (Tr. 308).  She described morning stiffness lasting two hours, and would rest during the day in a recliner or on a couch with a heating pad on her back or knees.  (Tr. 307-8).  She had sold a previous house because it had a staircase.  (Tr. 309).  She felt that she could lift 5 to 10 pounds, sit comfortably for 30 to 40 minutes, stand 20 to 30 minutes, and might be able to walk one block.  (Tr. 308-9).

A state agency employee who assisted Mrs. Barnett with her application observed that she was uncomfortable when sitting, and had to stand and move about toward the end of the interview.  (Tr. 110).

A portion of the medical evidence predates Mrs. Barnett's alleged onset date, including physical therapy notes from 2003 for hip and foot pain.  (E.g., Tr. 120, 130).  There was also treatment in 2004 by Dr. Gary Bray, an orthopedist, for a torn rotator cuff.  (Tr. 154-6).  In 2005, shortly before the alleged onset date, Dr. Bray prescribed physical therapy for low back pain after reviewing x-rays showing mild narrowing of the disc spaces and "a little" osteophyte formation.  (Tr. 156, 176).

The plaintiff began treatment from Dr. Kelly Cole, a rheumatologist, in October, 2001, several years before her onset date, on referral from her family physician, Dr. Pittman.  (Tr. 268).  She had developed pain in her knees, ankles, hips, shoulders, elbows, and PIP and MCP joints with aching and swelling.  (Id.).

On examination, her neck and spine were non-tender, but there was right knee crepitus and tender trapezius muscles.  (Tr. 269).  Dr. Cole noted that she had received oral information from Dr. Pittman's office indicating that the patient had a negative antinuclear antibody (ANA) test, but had a rheumatoid factor of 80 with 14 being normal and an elevated white count of 48.  (Tr. 270).  Dr. Cole's impression was of a history of a positive rheumatoid factor with joint swelling, pain and stiffness and "? rheumatoid arthritis."  (Id.).

There is an indication that the plaintiff saw Dr. Cole on other occasions between the first visit and her alleged onset date, but little detail.  (E.g., Tr. 267).  On April 6, 2006, Mrs. Barnett was complaining of increased shoulder and metatarsal pain, neck stiffness, and swelling of the feet, ankles, and fingers.  (Tr. 263).  Dr. Cole listed her impression as rheumatoid arthritis and noted that medications, which had apparently been previously prescribed, were well tolerated but of questionable efficacy.  (Tr. 264).  A subsequent office note from April, 2007 indicates that the rheumatoid arthritis was improved on Remicade, but the plaintiff noted in a May, 2007 office visit that the Remicade would wear off before she was scheduled to receive her next infusion.  She stated that she could not walk before the treatment.  (Tr. 273).  The plaintiff continued to make the same complaints in August, and also complained of headaches after the treatment, but Dr. Cole

prescribed continued five-week intervals and the possibility of raising the dose if she was still having symptoms.  (Tr. 271-2).

Dr. Cole wrote a letter on January 17, 2007 stating that Mrs. Barnett was seen for rheumatoid arthritis which was "severe" and required intravenous Remicade as well as methotrexate, which was a chemotherapy medication.  (Tr. 262).  Her patient had morning stiffness lasting several hours, severe fatigue, and periodic flaring involving the hands, wrists, knees, and shoulders.  She would be unable to stand or walk for any significant period of time secondary to the lower extremity involvement, and would not be able to do anything requiring fine manual dexterity or lifting greater than 10 pounds secondary to her upper extremity involvement.  Dr. Cole stated that she considered Mrs. Barnett to be disabled.  (Id.).

Regarding the family physician, Dr. George Pittman, it appears that the plaintiff was seen most often at his office by Jeryl Lynn Pittman, a registered nurse practitioner.  Nurse Pittman wrote a letter on August 30, 2007 stating that Mrs. Barnett suffered from rheumatoid arthritis, high cholesterol, hypertension, Type II diabetes, a sleep disorder, "MVP," and degenerative disc disease.  The rheumatoid arthritis gave her the most pain and trouble in her everyday life and was not under control despite rheumacid and methotrexate treatments.  She opined that the plaintiff could not walk, sit, or stand for long periods of time, and had to rest frequently during the day due to pain and fatigue.  (Tr. 279).

Prior to the receipt of these treating source opinions, Dr. James C. Owen conducted a consultative examination for the state agency.  (Tr. 196).  He noted the diagnosis of rheumatoid arthritis and reported that Mrs. Barnett had recently started the medication Enbrel which had helped considerably.  His examination showed a grip of only 6.5 kilograms in the right hand and 7 kilograms in the left hand, and she was able to get on and off the examination table and in and out of the room with mild difficulty.  The range of motion of the shoulders and neck was mildly diminished.  The range of motion chart attached to his report indicates a reduction in the range of motion of the wrists and lumbar spine, as well.  (Tr. 199-200).  Dr. Owen diagnosed probable rheumatoid arthritis with mild sequela to this point and no significant deformity noted, "but she is being treated aggressively per Dr. Cole." He opined that she would have "moderate to severe" difficulty lifting, handling, and carrying objects.  A laboratory report attached to Dr. Owen's report, but not mentioned in the narrative report, indicates that the plaintiff's rheumatoid factor was 40, well above the normal 14 or less.  (Tr. 201).

State agency physicians H. T. Anzures and S. Mukherjee reviewed the evidence in February and July, 2006 and concluded that the plaintiff could lift up to 50 pounds occasionally and 25 pounds frequently, with occasional climbing of ladders, ropes, and scaffolds and a need to avoid concentrated exposure to extreme cold and vibration.  (Tr. 203-9, 239-45).

The plaintiff maintains that the ALJ improperly discounted the treating physician opinions.  The court partially agrees.

The opinion of a treating physician is entitled to great weight, and is entitled to controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985).  The same regulation provides that the Commissioner is not required to give deference to a conclusory opinion that a claimant is "disabled."  20 C.F.R. § 404.1527(e)(1).  In addition, 20 C.F.R. § 404.1513(d)(1) provides that nurse practitioners are not considered "acceptable medical sources," although the Commissioner may use evidence to show the severity of the impairments and how it affects the ability to work.

With these factors in mind, it can be seen that the ALJ was not required to give controlling weight to Dr. Cole's opinion that the plaintiff was disabled, or to give controlling weight to Nurse Pittman's conclusion that the plaintiff could not walk, sit, or stand for long periods or needed to rest frequently during the day.  However, Dr. Cole was a specialist whose diagnosis and functional restrictions must be considered as that of a treating source.

The ALJ found that the plaintiff had medically determinable impairments which could reasonably be expected to produce the alleged symptoms, but her

statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely credible. The ALJ partially discounted Dr. Cole's functional restrictions from 2007 by citing her 2001 diagnosis of "questionable rheumatoid arthritis." (Tr. 22). Although the ALJ ultimately did find that the plaintiff was severely impaired by rheumatoid arthritis, there was no reason to mention the tentative diagnosis from over five years earlier except to attempt to undermine the validity of Dr. Cole's restrictions. In the next sentence, the ALJ appears to continue to question the rheumatoid arthritis diagnosis by asserting that Dr. Cole "ignored her own laboratory results in the form of a negative antinuclear antibody test (although Dr. Owen found the rheumatoid arthritis factor elevated at 40)." (Tr. 22). However, only 45 percent of persons with rheumatoid arthritis have a positive ANA test. 7 Ausman and Snyder, Medical Library, Lawyer's Edition, § 19:20. Thus, these are not particularly persuasive reasons to discount the opinion of a treating source.

The ALJ goes on to assert that in the April, 2006 office notes Dr. Cole described the plaintiff's rheumatoid arthritis as being "asymptomatic." (Tr. 22). The Commissioner echoes this assertion in his brief, indicating that the physician had abbreviated the word "asymptomatic" by writing "asx." Commissioner's Motion for Summary Judgment, Docket Entry No. 10, at 7. The court notes that the abbreviation "sx" is sometimes used by physicians to abbreviate the word "symptoms," and it is possible that a physician would write "asx" in order to

14

abbreviate "asymptomatic."  However, after careful review of the physician's handwritten notes, it appears that in this case, Dr. Cole was writing an upwards-pointing arrow in front of "sx."  Elsewhere in her notes the same symbol is used to indicate increased dosages or increased pain, as well as increased symptoms ("sx").  (E.g., Tr. 272, 275).  Apart from this, the entire April, 2006 office note is full of complaints of worsening pain, and as previously noted Dr. Cole was questioning the efficacy of the plaintiff's current medications.   (Tr. 263-4).   She also recommended additional x-rays of the hands, feet, and apparently the left shoulder, as well as an MRI of the left shoulder, and laboratory tests at this office visit.  (Tr. 264).  It would make little sense to question the efficacy of her drug regimen and order extensive objective testing if the plaintiff was asymptomatic.

Moreover, as the plaintiff notes in her brief, the medications Enbrel and Remicade are indicated, in combination with methotrexate, for patients with moderately to severely active rheumatoid arthritis, and both carry the risk of severe side effects.  Physicians' Desk Reference, (Bette Kennedy, ed., 2010), pp. 613-21, 919-30.  It is difficult to believe that these medications would be ordered for a person with no symptoms.  In addition, it should be noted that despite the plaintiff's allegations of side effects, and the complaints of side effects to Dr. Cole, these do not appear to have been considered by the ALJ as required by 20 C.F.R. § 404.1529(c)(3)(iv).

As the opinion of the treating physician was improperly evaluated, the decision will be remanded for further consideration.

This the 29th day of September, 2010.

Signed By:

_**G. Wix Unthank**_

**United States Senior Judge**